UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

RUBIN MOYE,

Defendant.

**ECF**

20 Cr. 215 (JPO)

# GOVERNMENT's MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS

JAY CLAYTON
United States Attorney for the
Southern District of New York

Frank Balsamello
Matthew Hellman
Michael Herman
Ashley Nicolas
Assistant United States Attorneys
*Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .......... 1

BACKGROUND .......... 1

A. Facts .......... 1
B. Moye's 2016 Case .......... 2
C. Moye's 2025 Indictment .......... 4
D. Discovery and Disclosures .......... 4

ARGUMENT .......... 5

I. THE DEFENDANT'S *GIGLIO* REQUEST IS NOT YET RIPE, AND HIS *BRADY* MOTION IS MOOT. .......... 5

II. THE DEFENDANT'S MOTION FOR RULE 404(B) NOTICE IS NOT RIPE .......... 7

III. THE COURT SHOULD DENY THE DEFENSE REQUEST FOR EXTENSIVE NEW VOIR DIRE PROCEDURES AND INSTRUCTIONS ON IMPLICIT BIAS .......... 8

IV. THE DEFENDANT IS BARRED FROM RELITIGATING A SUPPRESION MOTION THAT JUDGE DANIELS DENIED A DECADE AGO, AND THE MOTION IS MERITLESS IN ANY EVENT. .......... 11

A. Factual History .......... 12
B. Applicable Law .......... 13
C. Analysis .......... 15

V. THE DEFENSE REQUEST TO FILE, AMEND, AND SUPPLEMENT MOTIONS IS NOT RIPE, AND IN ANY EVENT, THE GOVERNMENT CONSENTS TO ANY FUTURE FILINGS, WITHIN REASON. .......... 16

CONCLUSION .......... 16

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to pretrial motions filed by defendant Rubin Moye (Dkt. ##48-50),[1] in which he seeks the following relief:

1. disclosure of *Giglio* material (*i.e.*, prior inconsistent statements) and *Brady* material (*i.e.*, statements inconsistent with the Government's prosecution theory);[2]
2. notice of evidence to be offered under Federal Rule of Evidence 404(b) with sufficient time for the defense to move to preclude it;
3. special voir dire procedures and a preliminary instruction on implicit bias;
4. suppression of a firearm seized on March 3, 2016; and
5. the right to file, supplement, and amend motions "as appropriate."

All these motions should be denied either on their merits (motions 3 and 4) or on grounds of mootness (motion 1 as to *Brady*) and un-ripeness (motion 1 as to *Giglio*, and motions 2 and 5).

## BACKGROUND

### A. Facts

The Government anticipates that its evidence at trial will prove, in substance and part, that since the 1990s, the defendant has been a member of the Santana Block set of the national Crips gang, and he was involved in the distribution of controlled substances including principally crack cocaine. Prior to his 2016 arrest (discussed below), many of the defendant's gang- and drug-related crimes occurred at and around a pair of apartment buildings at 2000 Valentine Avenue and 1985 Webster Avenue, collectively known as "2 Stacks."

---

[1] The defendant's Memoranda of Law, Dkt. #50, is referred to as the "Motion" or "Def.'s Mot."

[2] Referring to *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Brady*, 373 U.S. 83 (1963).

Within those buildings, gang members and drug dealers also came to use the name "Money Over Everything" or "MOET"—sometimes extended to "2 Stacks MOET"—and from the 1990s to in or about 2011, they were almost entirely Crips. In or about 2011, a young member of the gang known as "Flea" changed his affiliation to the Young Gunnaz or "YGz" gang, and he started to convert other younger MOET members. This schism sparked intense and violent conflict between the Crips and YGz, including the July 2011 murder of the defendant's brother and fellow Crip, Renney Moye—a murder that the defendant and others came to believe had been committed by a particular member of the YGz.

As a dedicated leader of the Crips who had committed gang-related violence in the past,[3] the defendant participated in the Crips-YGz war by both personally committing shootings and directing others to do so. For example, as alleged in the Indictment: on November 19, 2011, the defendant personally shot a rival's mother in the head; and on August 4, 2011 and March 4, 2015, the defendant caused co-conspirators to seek out and kill other victims with the intent to target people associated with the same rival.

**B. Moye's 2016 Case**

On March 3, 2016, the defendant was arrested after a firearm was found on his person during a routine traffic stop. *See United States v. Moye*, 16 Cr. 250 (GBD) (the "2016 Case"), Dkt. #1 (Complaint). Later that month, a grand jury in this District returned an indictment charging him with a violation of 18 U.S.C. § 922(g). *Id.*, Dkt. #6.

About four months later, the defense moved to suppress the firearm on Fourth Amendment grounds, arguing that the arresting officers (the "Arresting Officers") lacked

---

[3] For example, in November 2000, the defendant pled guilty to first-degree manslaughter after he killed someone during a gang-related confrontation.

sufficient cause to stop the defendant's car or conduct a patdown of his person. *Id.* Dkt. ##16-20. The Honorable George B. Daniels received briefing from the Government, *id.* Dkt. #24; held an evidentiary hearing at which both Arresting Officers testified; *id.* Dkt. #26; and received post-hearing briefing, *id.* Dkt. ##30, 32. On September 29, 2016, Judge Daniels orally denied the motion, holding that the Arresting Officers' testimony was credible, they had observed a traffic violation that justified stopping the defendant's car, they had probable cause to arrest the defendant for driving without a license and thus authority to pat him down incident to arrest, and the patdown was supported by reasonable suspicion based on the defendant's behavior and demeanor during the stop. *Id.* Dkt. #34 at 3-7.

The defendant proceeded to trial in January 2017, resulting in a hung jury. *See* 2016 Case, Dkt. ##56-63. During the trial, the defendant communicated to other Crips at the Metropolitan Correctional Center ("MCC") that they should attack a cooperating witness (the "CW") whose proffer notes had been disclosed to the defense shortly before trial pursuant to 18 U.S.C. § 3500. On or about January 18, 2017, two other inmates housed in the same unit as the Crips attacked the CW, stabbing and bludgeoning him until guards were able to stop the assault. On February 21, 2017, a grand jury returned a Superseding Indictment that added charges of witness tampering and retaliation in violation of 18 U.S.C. §§ 1512(a)(2), 1513(b)(2), and 2.

While awaiting his retrial, the defendant asked the Court to reopen the suppression hearing, arguing that pretrial disclosures and trial testimony had revealed that a New York City Police Department ("NYPD") Field Intelligence Officer (the "FIO") had obtained information about—and conducted surveillance of—the defendant's vehicle shortly before the Arresting Officers conducted their traffic stop, thus raising doubt about the Arresting Officers' testimony that they had independent probable cause. *See* 2016 Case, Dkt. #65. The Government opposed,

*id.* Dkt. #66, and the Court heard argument and denied the motion, holding that no new information warranted reopening the suppression hearing or reconsidering the Court's prior ruling, *id.* Dkt. #79 at 18-23.

In April 2017, the defendant was retried and found guilty of all charges, including the initial § 922(g) offense stemming from his March 3, 2016 arrest. *See* 2016 Case, Dkt. ##92-101. On August 16, 2018, Judge Daniels sentenced the defendant to a term of 192 months' imprisonment, which the defendant is now serving. *Id.* Dkt. #122.

**C. Moye's 2025 Indictment**

On February 6, 2025, a grand jury returned a six-count Indictment, which charged him with causing the Richards Murder and the Cox Murder, each under three different statutory provisions: murder in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and 2; murder while engaged in a narcotics conspiracy, in violation of 18 U.S.C. §§ 848(e)(1)(A) and 2; and murder through the use of a firearm, in violation of 18 U.S.C. §§ 924(j) and 2.

**D. Discovery and Disclosures**

To date, the Government has made five productions of discovery between March 18, 2025 and April 24, 2026.[4] These productions include extensive law enforcement files relating to the Richards and Cox Murders, the Victim-1 Shooting, and dozens of other arrests, convictions, and incidents of violence involving the defendant, his fellow Crips, and/or his rival YGz.[5] It also

---

[4] The most recent was a relatively small production that included only material related to the defendant's time at the Metropolitan Detention Center since he was charged in this case, including his use of a contraband cellphone and his medical care (some records were previously sent to defense counsel). It also included additional material relevant to certain DNA evidence, which the Government collected in response to a defense request in late-January of this year. Prior to that, discovery had been largely completed in September 2025.

[5] By letter dated March 17, 2025, the Government also listed separate cases charged in this District that have at least some connection to this matter, such as geographical and temporal overlap or the involvement of people somehow linked to the Crips, YGz, or their associates and rivals. As conveyed in that letter, the Government has not undertaken comprehensive reviews or productions of materials from

includes cellphone and social media data, publicly visible YouTube content, interview recordings, jail call recordings and emails, and copies of search warrants used to obtain evidence. Finally, on June 17, 2025 and September 15, 2025, the Government provided defense counsel with letters that chronicle dozens of witness statements or pieces of evidence that could, under a most expansive reading, be construed as inconsistent with the prosecution's theory of the case or supportive of any defense that the prosecution team could imagine.[6]

Aside from a discussion about the Protective Order designations of certain materials,[7] the defense has not conveyed any specific questions or concerns about the nature or completeness of discovery or disclosures.

## ARGUMENT

### I. THE DEFENDANT'S *GIGLIO* REQUEST IS NOT YET RIPE, AND HIS *BRADY* MOTION IS MOOT.

Local Criminal Rule 16.1 requires that defense counsel confer with the Government *before* filing a motion for a bill or particulars or on any other issue related to discovery:

> No motion addressed to a bill of particulars or any discovery matter shall be heard unless counsel for the moving party files in or simultaneously with the moving papers an affidavit certifying that counsel has conferred with counsel for the opposing party in an effort in good faith to resolve by agreement the issues raised by the motion without the intervention of the Court and has been unable to reach agreement. If some of the issues raised by the motion have

those cases, but the defense is invited to request inspection in the event they believe such files may contain something relevant to their defense.

[6] To minimize the risk of the prosecution failing to think up a conceivable defense, the letters also invited the defense to "Please let us know any time if you would like to alert us to any potential defense theory, as this would assist us in our ongoing efforts to identify material that may support your view of the case."

[7] Specifically, in March 2026, the defense identified three categories of material for the Government to consider redesignating "Attorneys Possession Only" in lieu of "Attorneys Eyes Only." The parties subsequently had a productive discussion by phone, and the Government is awaiting specific Bates identifiers for the documents at issue, in hopes of reaching agreement on some, if not all, of the specific documents.

> been resolved by agreement, the affidavit shall specify the issues remaining unresolved.

*Available at* pages 94-95 of https://www.nysd.uscourts.gov/sites/default/files/local_rules/2021-10-15%20Joint%20Local%20Rules.pdf (last viewed May 16, 2022). This Rule is regularly enforced in this District. *See, e.g.*, *United States v. Blondet*, 16 cr. 387 (JMF), 2022 WL 507698, at *2 (S.D.N.Y. Feb. 18, 2022) ("By itself, that failure [to comply with the Rule] is fatal to the motion." (citing *United States v. Goode*, No. 16 Cr. 529 (NSR), 2018 WL 919928, at *15 (S.D.N.Y. Feb. 15, 2018); *United States v. Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014))); *United States v. Felton*, No. 17 Cr. 21 (WHP), Dkt. #311 at 3 (citing *Goode* for the proposition that, "[a]s a threshold matter, the motion [for a bill of particulars] is 'procedurally barred' for failure to comply with Local Criminal Rule 16.1, based on counsel's concession at oral argument that he had not conferred with the Government."). The defense's declaration in support of its Motions acknowledges that the Government has been available to discuss discovery concerns, and to date, there have been no unresolved issues. *See* Dkt. #49 at 2 n.1.

With respect to *Giglio* material, the Government intends to produce any impeachment material in its possession sufficiently in advance of trial to allow the defense to make use of it in cross-examination, on a schedule to be set by the Court. *Cf.* Dkt. ##17, 29 at 2-3 (Rule 5(f) Order stating that *Giglio* material "must be disclosed sufficiently in advance of trial in order for the defendant to make effective use of it at trial or at such other time as the Court may order").[8] This is what the Court's Rule 5(f) Order already requires and what the Government intends to

[8] It appears that the Rule 5(f) Order entered with respect to this defendant is missing the second page; however, the Government assumes its language in the order entered for co-defendant Lasalle Herrmann, which tracks standard language in this District.

do.[9] Any dispute about the timing of such pretrial disclosure is not yet ripe, especially as a trial date has not even been set yet.

Turning to *Brady*, the Government has endeavored to provide exactly the kinds of witness statements and other material that the defense is requesting. As described above, the Government has been diligent and attentive to its obligations, has drawn inferences in favor of disclosure, and will continue to do so up to and through trial. Moreover, the Government has repeatedly invited defense counsel to make particular requests, and the parties have engaged in fruitful discussions when such requests have been made. The invitation to do so stands. Accordingly, there is currently no basis for a Court order relating to discovery.

## II. THE DEFENDANT'S MOTION FOR RULE 404(B) NOTICE IS NOT RIPE.

The defendants' request for 404(b) notice likewise requires no judicial action at this time. Federal Rule of Evidence 404(b) already requires the Government to "provide reasonable notice of any such evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it." FED. R. EVID. 404(b)(3). The discovery produced thus far also already

[9] Such advanced disclosure was not always the norm: as recently as 2017, it was "[t]he practice in this District is to provide both *Giglio* and Jen[c]ks Act material at the same time, which should be ***at least one day*** prior to the testimony of the witness," *United States v. Rivera*, No. 16 Cr. 175 (LGS), 2017 WL 1843302, at *2 (S.D.N.Y. May 8, 2017) (emphasis added, internal quotation omitted), and although the Government often produced material earlier than that, Courts consistently denied motions to compel it. *See, e.g.*, *id.* ("Because Defendants have not identified any special circumstances necessitating early disclosure, their motions to compel the early production of *Giglio* and Jencks Act material are denied."); *United States v. Rodriguez-Perez*, No. 10 Cr. 905 (LTS), 2012 WL 3578721, at *11 (S.D.N.Y. Aug. 16, 2012) (denying motion to compel early production of *Giglio* and 3500 material where Government indicated intent to produce one week before trial); *United States v. Okpomo*, No. 09 Cr. 143 (LBS), 2009 WL 1211403, at *3 (S.D.N.Y. May 5, 2009) ("Although the Second Circuit has encouraged pretrial disclosure [of 3500 material] in complex cases to avoid delays during trial, the statute does not enable courts to compel early disclosure." (citing *United States v. Percevault*, 490 F.2d 126, 132 (2d Cir.1974))); *United States v. Gallo*, No. 98 Cr. 338 (JGK), 1999 WL 9848, at *7-8 (S.D.N.Y. Jan. 11, 1999) (denying defendants' motions to require the early production of *Giglio* and 3500 material); *United States v. Gutierrez-Flores*, No. 94 Cr. 393 (CSH), 1994 WL 558034, at *3 (S.D.N.Y. Oct. 11, 1994) ("The defendants' request for material which would assist in impeaching confidential informants or government witnesses is premature. The government is not required to disclose such material until the witness is called to testify.").

alerted the defendants to particular incidents and arrests that the Government may seek to prove at trial, either as direct evidence or under Rule 404(b). But in any event, the Government expects to provide more specific notice on a schedule for pretrial notices and filings as set by the Court, including 404(b) notice prior to the date for motions *in limine*.

## III. THE COURT SHOULD DENY THE DEFENSE REQUEST FOR EXTENSIVE NEW VOIR DIRE PROCEDURES AND INSTRUCTIONS ON IMPLICIT BIAS.

The defense's request for expanded voir dire is not yet ripe, as the parties do not even have a date by which they are to propose voir dire questions or procedures to the Court. One of the defendant's suggestions—that "unconscious bias" be mentioned alongside simply "bias" within the Court's preliminary instructions, *see* Def.'s Mot. at 15-16—may not ultimately draw objection from the Government, depending on the context and other instructions being provided.

On the other hand, the defendant's additional proposals—using a jury questionnaire or attorney-led voir dire, and playing an 11-minute-long orientation video on implicit bias, *see id.* at 14-15—are unnecessary and inappropriate under controlling Second Circuit and Supreme Court precedent. They are unnecessary because this District's typical bias-related instructions and voir dire questions already clearly and efficiently address the topic of bias, without inviting the attorneys to engage in direct and superfluous conversations with jurors, and without spinning off into lengthy discussions of psychology, philosophy, and sociology. Typical instructions and voir dire expressly direct jurors that they must decide the case fairly and impartially, without allowing bias to enter their considerations; and they emphasize the presumption of innocence that applies at all times until the jury *deliberates*, carefully considers the evidence, and reaches a unanimous verdict. These steps—calling attention to the risk of jurors allowing bias to enter considerations and the need for jurors to participate in careful deliberation rather than reflexive decision-

making—are exactly what is needed to mitigate the danger that unconscious biases and other mental "shortcuts" will influence the jury's verdict. Nothing more is needed.[10]

While playing a video in which attorneys expound on evolving psychological research is not needed for a fair trial, it does risk substantial confusion and other harm. Indeed, at least one court has recognized that "existing procedures" for "voir dire and jury instructions" "already exist to address the bias concerns raised by the Defendant," whereas "the unconscious bias video bears its own risk of ***injecting prejudice and confusion into this case***." *United States v. Smith*, 23 Cr. 126 (RDB), 2024 WL 3568887, at *1 (D. Md. July 29, 2024) (emphasis added). For example, the video, and similarly expansive jury instructions, may have the effect of confusing and alienating jurors by telling them that they are unequivocally biased without any knowledge of their personal experiences or perspectives. Some jurors may also feel compelled to research or react to the unnamed studies referenced throughout the video or the attorney-speakers, who do not offer any credentials to support their presentation of expertise. Others may note that the proposed video focuses only on bias based on race, sex, age, nationality, and religion and principally on how bias may prejudice a defendant, without similar attention to many other potential areas of unconscious bias or the ways in which jurors' thinking may be tainted against witnesses, law enforcement officers, prosecutors, or the Court itself. Worst of all, multiple studies on unconscious bias have shown that unconscious bias training may sometimes have the *reverse* effect as was intended, resulting in *more discrimination*, not less. *See* Harvard Business

---

[10] The rationale for a court to engage in such expansive voir dire and instruction on the single isolated topic of unconscious bias would support the similar position that the court should lecture the jury on how to avoid any number of logical fallacies, lest jurors fall for red herrings, cherry picking, or appeals to emotion in the parties' arguments. For example, a defense summation that focuses a cooperating witness's prior bad acts may descend into *ad hominim* attack that is irrelevant to the witness's credibility or the accuracy of his testimony. But the Government is not aware of any history or law favoring a protracted voir dire that seeks to address all aspects of jurors' thought processes.

Review, *Unconscious Bias Training That Works* (Sept.-Oct. 2021), *available at* www.hbr.org/2021/09/unconscious-bias-training-that-works.

Under longstanding Supreme Court and Second Circuit precedent, this Court need not and should not exercise its "broad discretion" to expand voir dire in these ways. *United States v. Green*, No. 22-3217, 2024 WL 4488577, at *3 (2d Cir. Oct. 15, 2024) (quoting *United States v. Nieves*, 58 F.4th 623, 626 (2d Cir. 2023)), *cert. denied,* 145 S. Ct. 1215 (2025). As explained in *Green*, a trial court's decision to limit voir dire will be reversed only if:

> (1) *voir dire* was "so demonstrably brief and lacking in substance" that counsel had too little information to draw any conclusions about a potential juror's general outlook, experience, and lifestyle; (2) "a systematic or pervasive bias ... exist[ed] at the time of trial[ ] in the community" that would have been cured had the court made the inquiries requested by counsel; or (3) the record, when "viewed in its entirety," suggests "a substantial possibility" that the jury misunderstood its duty to weigh certain evidence fairly and that such misunderstanding "would have been clarified by asking a requested *voir dire* question."

*Id.* (quoting *United States v. Lawes*, 292 F.3d 123, 129 (2d Cir. 2002)). The Government fully expects that the Court will conduct a substantive and robust voir dire, and that no pervasive bias or juror misunderstanding will affect this trial. The defendant certainly has not met his burden of showing otherwise. *Id.* (defendant "bears the burden of establishing 'substantial indications' that racial prejudice likely affected the jury." *Id.* (quoting *United States v. Kyles*, 40 F.3d 519, 524 (2d Cir. 1994)).

In recent years, Judges in this District have uniformly declined to show the proposed video, and the Second Circuit has not found an abuse of discretion in any case it has reviewed. *See, e.g.*, *See United States v. Berry*, 20 Cr. 84 (AJN) (trial September 2021); *United States v. Beltran*, 21 Cr. 17 (KPF) (trial September 2021); *United States v. Cortorreal*, 17 Cr. 438 (VEC) (trial April 2023); *United States v. Garcia*, 19 Cr. 862 (VEC) (trial June 2023); *United States v.*

*Grayson*, 23 cr. 614 (JLR) (trial September 2024); *United States v. Sands*, 24 Cr. 288 (ALC) (pled at start of trial April 2025); *United States v. Small*, 24 Cr. 208 (VEC) (pled shortly before trial October 2025); *U.S. v Wallace*, 24 Cr. 411 (MKV) (trial December 2025). *See also United States v. Lou*, No. 24 Cr. 99 (AMD), 2025 WL 2753704, at *2 (E.D.N.Y. Sept. 29, 2025) (holding that the video "is not necessary to protect Defendant's right to a fair and impartial jury under the Sixth Amendment" and that showing it risked improperly highlighting one instruction over all others (citing *United States v. Jessamy*, 464 F. Supp. 3d 671, 678 (M.D. Pa. 2020), for the latter proposition)); *United States v. Smith*, 23 Cr. 126 (RDB), 2024 WL 3568887, at *1 (D. Md. July 29, 2024) ("Multiple courts have denied defense requests to play unconscious bias videos such as the one at issue here," citing cases from Eleventh Circuit, Southern District of Ohio, District of Nevada, and Eastern District of Pennsylvania). The defense has not cited—and the Government is not aware of—a single S.D.N.Y. case in which the Court agreed to play the proposed video.[11]

For all of these reasons, the Court should deny the defendant's motion, without prejudice to future proposals of precise and narrow voir dire language that may be incorporated into the Court's usual voir dire questions and preliminary instructions on bias.

## IV. THE DEFENDANT IS BARRED FROM RELITIGATING A SUPPRESION MOTION THAT JUDGE DANIELS DENIED A DECADE AGO, AND THE MOTION IS MERITLESS IN ANY EVENT.

In moving to suppress the firearm seized from him on March 3, 2016, it appears the defense misapprehends the circumstances of the vehicle stop that led to his arrest—an issue that

[11] The Second Circuit has held that even simple voir dire questions about *any* racial prejudice (including *overt* prejudice) are not required *at all* absent "substantial indications" that racial or ethnic prejudice are likely to affect jurors in a particular case. *United States v. Diaz*, 854 Fed. App'x 386, 388 (2d Cir. 2021) (summary order holding that District Court did not abuse discretion by declining to give short definition of, and ask questions about, implicit racial bias, citing *Rosales-Lopez v. United States*, 451 U.S. 182, 190 (1981), and *Ristaino v. Ross*, 424 U.S. 589 (1976)).

was already the subject of a suppression hearing and significant additional litigation before Judge Daniels in 2016 and 2017, resulting in the admission of the gun at trial and ultimately the defendant's conviction for possessing it. The Government's briefs on this issue are at docket numbers 24 and 32 in the 2016 Case (16 Cr. 250 (GBD)), and testimony from the defendant's second trial in that case (Dkt. ##92-101) are cited below as "Tr."

More fundamentally, the defendant has not cited any substantial new evidence or extraordinary circumstances that would justify reconsidering Judge Daniels's prior denial of a materially identical motion nearly ten years ago. He should therefore be collaterally estopped from relitigating the same issue here.

**A. Factual History**

By way of factual background, on March 3, 2016, at approximately 10:30 p.m., the Arresting Officers were on patrol in a high-crime section of the Bronx when they observed a gray Dodge Charger make a turn without signaling. *See* Tr. at 41-46, 432-35. They conducted a traffic stop and encountered the defendant, who appeared nervous and was unable provide a driver's license. *Id.* at 52-54, 441-43. Based on the totality of the circumstances, one of the Arrest Officers asked the defendant to step out of the vehicle and patted him down. *Id.* at 54-55, 443. During the patdown, one of the Arresting Officers felt a hard object in the groin area of the defendant's pants, which the Officers retrieved and found to be a loaded .38-caliber revolver in a black bag tucked. *Id.* at 55-56, 443-46.

In his 2016 Case, the defendant moved to suppress the firearm as the fruit of an allegedly unlawful traffic stop and unlawful patdown. At an August 2016 suppression hearing, the Arresting Officers testified to the same facts set forth above, *see* 2016 Case, Dkt. #26; and Judge Daniels denied the motion to suppress, finding that the Arresting Officers' credible testimony

established that they had sufficient cause to stop the defendant and conduct a patdown, especially after the defendant was unable to present a driver's license at the outset of the traffic stop, as required by law and as needed to ascertain his identity and issue a ticket. *Id.* Dkt. #34 at 3-7.

Unrelatedly, about two days before the Arresting Officers encountered the defendant, the Precinct FIO debriefed an arrestee and fathered information about the defendant driving a gray Dodge Charger and carrying a gun. Tr. at 569-70, 574. The FIO worked to identify the Charger and surveilled it for about 30 or 40 minutes during the evening of March 3, 2016. *Id.* at 574-76. Upon learning of the defendant's arrest later that night, the FIO sent his supervisor a document that falsely claimed he had shared information about the defendant with the Arresting Officers' unit. *Id.* at 578-82. The Arresting Officers testified that they had not received such information from the FIO, *see id.* at 73, 89, 433-34, 466-67; and the line in his document about sharing information was not accurate and had been drafted to avoid facing difficult questions about why he had not acted on the tip sooner, *see id.* at 582-83, 589-95.

Between the defendant's January and April trials, the defendant again sought to suppress the firearm seized from him on March 3, 2016, now based on the FIO's admittedly inaccurate statement to his supervisor that he had shared information relating to the defendant prior to the defendant's arrest. *See* 2016 Case, Dkt. #65. Judge Daniels denied the motion, holding that none of the new information relating to the FIO caused him to change his evaluation of the Arresting Officers' credibility or the legality of their traffic stop or patdown of the defendant. *Id.* Dkt. #79 at 18-23.

**B. Applicable Law**

The doctrine of collateral estoppel applies to criminal suppression motions. In *United States v. Shaw*, 16 Cr. 642 (RJS), 2017 WL 1380598 (S.D.N.Y. Apr. 13, 2017), then-District

Judge Richard J. Sullivan held that a defendant was "collaterally estopped from relitigating the validity of" a vehicle stop and search because a New Jersey state court had already denied a materially identical motion several years earlier. *Id.* at *3-*5. In so doing, Judge Sullivan observed that "the Second Circuit has . . . instructed that 'a prior decision by another court on a motion to suppress is not ordinarily reconsidered in the absence of substantial new evidence or extraordinary circumstances.'" *Id.* at *4 (quoting *Laaman v. United States*, 973 F.2d 107, 113 (2d Cir. 1992)).[12] Judge Sullivan also collected cases from around the country, including the Eight Circuit, Eastern District of New York, District of Massachusetts, and District of Kansas as similarly applying the doctrine; and he cited the Honorable Jed S. Rakoff as "likewise conclud[ing] that a criminal defendant was collaterally estopped from relitigating a Fourth Amendment issue that had previously been 'vigorously litigated over a three-day hearing' before a different [S.D.N.Y] district judge." *Id.* (citing *United States v. Walker*, 16 Cr. 567 (JSR), 2017 WL 877325, at *2 (S.D.N.Y. Mar. 5, 2017)).

More recently, the Second Circuit affirmed the constitutionality of collateral estoppel as applied to criminal suppression litigation. *United States v. Jones*, 43 F.4th 94, 103 (2d Cir. 2022). In *Jones*, the Circuit noted that it had "previously suggested in dicta that a defendant may be precluded from relitigating a motion to suppress," and that "Supreme Court teaching in a related context supports—and may even require—the same conclusion." *Id.* (citing *Laaman* and *Allen v. McCurry*, 449 U.S. 90, 103-05 (1980) (defendant whose suppression motion was denied may be precluded from relitigating issue in subsequent civil action under 42 U.S.C. § 1983)).

[12] *Laaman* in turn cited authorities from the D.C., Fourth, and Third Circuits, Northern District of Illinois, and a LeFave treatise. 973 F.2d at 113.

If this Court finds that collateral estoppel does not apply based on Judge Daniels's prior denial of a materially identical motion in the defendant's 2016 Case, the Government's argument on the merits relies on the Fourth Amendment law previously briefed in that earlier litigation, *see* Dkt #24 at 5-7, #32 at 1-2 & n.2.

**C. Analysis**

The defendant's motion cites to no new facts or other circumstances that were unknown or undeveloped in the 2016 Case's suppression litigation. All of it, from the priopriety of the stop and patdown to the (non-)involvement of the FIO, was aired more than once before Judge Daniels. A routine application of the collateral estoppel doctrine should bar the defendant from getting another bite at this old apple.

If, however, the Court decides to readdress the Fourth Amendment issue, the Government relies principally on its merits briefing in the 2016 Case, *see* Dkt. #24 at 7-14, #32 at 1-3, with one additional supplement: the defendant's entire narrative of events leading up to the traffic stop relies on a statement in an FIO document that the FIO himself admitted, twice, under oath, was not accurate. There is simply no support anywhere—either in the 2016 Case record or now offered in connection with this motion—for the notion that the FIO told the Arresting Officers about the defendant or that the Arresting Officers had pulled over the defendant's car based on a prior tip in an FIO debrief. The only information, sworn to repeatedly in open court, is that this did not happen, and the Arresting Officers in fact stopped the defendant's car because they observed him commit a traffic violation.

Furthermore, no hearing would be required for the Court to rule on the merits (if the Court finds the whole matter is not barred by collateral estoppel) because all of the relevant witnesses have already testified two or three times about these same events, under oath and

subject to cross examination by this same defendant. That prior testimony readily establishes the factual record consistent with the Government's recitation above. Although the defendant sets forth contrary facts, he does so in direct contradiction of the robust existing record, *see, e.g.*, Def.'s Mot. at 18 (asserting that the FIO "called the [Arresting Officers] for backup"), without any citation to new evidence or authority, and on points that are wholly immaterial to the propriety of the traffic stop and patdown, *see, e.g.*, Def.'s Mot. at 17 (suggesting, incorrectly, that the defendant's car was also searched, which even if true would be irrelevant to prior investigative steps).

At bottom, this issue was litigated to the hilt a decade ago, and even notwithstanding the defendant's incorrect factual summary, there is no basis for the Court to revisit it again.

## V. THE DEFENSE REQUEST TO FILE, AMEND, AND SUPPLEMENT MOTIONS IS NOT RIPE, AND IN ANY EVENT, THE GOVERNMENT CONSENTS TO ANY FUTURE FILINGS, WITHIN REASON.

Assuming, as the Government does, that the defense's future motions, amendments, and/or supplements follow regular practices in this District and are not somehow unreasonable or vexatious, the Government does not anticipate objecting to such filings.

## CONCLUSION

For the foregoing reasons, all of the Defense Motions should be denied at this time.

Respectfully submitted,

Dated: April 28, 2026
New York, New York

JAY CLAYTON
United States Attorney for the
Southern District of New York

By: /s/ Frank J. Balsamello

Frank Balsamello / Matthew Hellman
Michael Herman / Ashley Nicolas
Assistant United States Attorneys
(212) 637-2325 / -2278 / -2221 / -2467